1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

A.T. and C.T., parents of L.T.,

9

                    Plaintiffs,

10

        v.

11

FIFE SCHOOL DISTRICT,

12

                    Defendant.

CASE NO. C14-5790 BHS

ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND
DENYING PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT

13

14        This matter comes before the Court on the parties' cross-motions for summary

15 judgment (Dkts. 24, 27).  The Court has considered the pleadings filed in support of and

16 in opposition to the motions and the remainder of the file and hereby rules as follows:

17                            **I. PROCEDURAL HISTORY**

18        On October 3, 2014, Plaintiffs A.T. and C.T. ("Plaintiffs") filed a complaint

19 against Defendant Fife School District ("District") under the Individuals with Disabilities

20 Education Act ("IDEA"), 20 U.S.C. § 1415(1)(2)(A).  Dkt. 1.  Plaintiffs seek review of

21 the Administrative Law Judge's ("ALJ") decision that the District did not deny Plaintiffs'

22 daughter, L.T., a free appropriate public education.  *Id.*

On June 3, 2015, the parties filed cross-motions for summary judgment.  Dkts. 24, 27.  On June 22, 2015, the parties responded.  Dkts. 29, 30.  On June 26, 2015, the parties replied.  Dkts. 31, 32.

## II. STATUTORY FRAMEWORK

Before turning to the facts and legal issues in this case, the Court begins with a brief overview of the IDEA.  "The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education and providing financial assistance to enable states to meet their educational needs."  *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992) (citing *Honig v. Doe*, 484 U.S. 305, 310 (1988)).  The IDEA's primary purpose is "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  "This purpose is achieved through the development of an individualized education program ('IEP') for each child with a disability."  *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993) (citing 20 U.S.C. § 1401(a)(18)(D)).  "The IEP is crafted annually by a team that includes a representative of the local educational agency, the child's teacher and parents, and, in appropriate cases, the child."  *Id.* (citing 20 U.S.C. § 1414(a)(5)).

A school district may violate the IDEA in two different ways.  "First, a school district, in creating and implementing the IEP, can run afoul of the Act's procedural requirements."  *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 432 (9th Cir. 2010) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176

1   (1982)).  However, "not every procedural violation results in the denial of a free

2   appropriate public education." *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 953 (9th

3   Cir. 2009).  "A procedural violation denies a free appropriate public education if it results

4   in the loss of an educational opportunity, seriously infringes the parents' opportunity to

5   participate in the IEP formulation process or causes a deprivation of educational

6   benefits." *Id.*  "Second, a school district can be liable for a substantive violation by

7   drafting an IEP that is not reasonably calculated to enable the child to receive educational

8   benefits." *J.W.*, 626 F.3d at 432.  While school districts are not required to "maximize

9   each child's potential," they must provide a "basic floor of opportunity." *Rowley*, 458

10  U.S. at 198, 200.  With this framework in mind, the Court turns to the facts and issues in

11  this case.

## III. FACTUAL BACKGROUND

**A.      L.T.'s Background**

14          As a young child, L.T. was neglected and abused by her biological parents.  AR

15  763–64.  L.T. was removed from her biological parents' care and placed in several foster

16  homes.  *Id.*  Plaintiffs adopted L.T. when she was five years old.  AR 763.

17          Beginning in the first grade, the District began serving L.T. under a 504 plan.[1]  AR

18  770.  When L.T. started third grade in June 2008, the District determined that L.T. was

19  eligible for special education services under the IDEA.  AR 2853.  L.T.'s initial IEP

---

21          [1] "A 504 plan refers to a plan developed in accordance with the Rehabilitation Act of
    1973, 28 U.S.C. § 794, which provides for reasonable accommodations in education for children

22  with disabilities." *E.J. ex rel. Tom J. v. San Carlos Elementary Sch. Dist.*, 803 F. Supp. 2d 1024,
    1027 n.3 (N.D. Cal. 2011).

1   noted that L.T. "exhibits very high levels of hyperactivity, anxiety, depression,

2   somatization, learning problems, atypicality, and low functional communication."  AR

3   2635.

4   **B.   May 2011 Evaluation**

5   In September 2010, L.T. began sixth grade at Surprise Lake Middle School

6   ("Surprise Lake").  *See* AR 2853.  In January 2011, the District initiated its triennial

7   evaluation of L.T.'s educational needs with Plaintiffs' consent.  AR 2866–67, 2872.  As

8   part of this evaluation, the District considered an April 2011 report about L.T. from the

9   University of Washington Fetal Alcohol Syndrome Diagnostic and Prevention Network.

10   AR 2838–52, 2874.  The UW report concluded that L.T. did not have fetal alcohol

11   syndrome, but did show signs of significant central nervous system damage, described as

12   "static encephalopathy."  AR 2839.

13   In May 2011, the District completed its evaluation.[2]  AR 2853–65, 2866.  The

14   evaluation notes that "academic testing indicates [L.T.] is at or near grade level" in core

15   areas such as basic reading skills, reading comprehension, and written language.  AR

16   2863.  The evaluation further states:

17   > Other than specific delays in her reading fluency, math calculation
   > skills, and written expression, [L.T.] is academically at grade level.  This
18   > may not appear to be the case in a general education classroom, however,
   > due to extreme inattentiveness, distractibility, anxiety, emotional liability,
19   > poor work completion, and inability to work independently.

20

21

22   [2] The completion of the District's evaluation was delayed with Plaintiffs' consent due to
   L.T.'s testing at UW.  AR 2868–69.

AR 2862.  The evaluation recommends increased general education participation with para-professional support for L.T.'s stronger areas (i.e., basic reading skills, reading comprehension, and written language) and a resource room setting for her more difficult areas (i.e., math, social skills, and study skills).  AR 2863.  Finally, the evaluation notes that L.T. does not currently qualify for communication services.  AR 2860.

**C.      May 2011 IEP**

On May 11, 2011, L.T.'s IEP team, including Plaintiffs, met to review L.T.'s evaluation results and develop L.T.'s annual IEP.  AR 2873, 2876–90.  The May 2011 IEP provides for special education services in reading, written language, math, social emotional/behavior, and study skills.  AR 2888.  The IEP also provides for fifteen minutes of communication services per month.  *Id.*  The IEP team determined that L.T.'s least restrictive environment was a general education class with para-professional support.  AR 2880, 2888.  The team agreed this placement would start the following school year for a four-week trial period.  AR 2880.

In September 2011, L.T. began seventh grade at Surprise Lake.  Pursuant to her May 2011 IEP, L.T. was placed in a general education language arts classroom with para-professional support.  AR 2893.  In December 2011, L.T.'s IEP team met to discuss L.T.'s placement.  AR 2894.  Due to L.T.'s success in her current placement, L.T.'s IEP team determined that her placement should continue for the remainder of her May 2011 IEP.  AR 2894–95.  The IEP team also determined that L.T. would be best served in a special education reading class rather than a general education reading class.  AR 2894–

95.  With Plaintiffs' consent, the IEP team amended L.T.'s IEP to reflect these changes.
AR 2893, 2896.

In January 2012, the IEP team amended L.T.'s IEP again.  AR 2898.  Due to
L.T.'s "overall success in both her general education and special education placements,"
the IEP team reduced L.T.'s social emotional instruction from forty-seven minutes per
day to ten minutes per day.  AR 2898.  Plaintiffs consented to this change.  *Id.*

In February 2012, the District prepared a progress report for L.T.  AR 2909–12.
The report shows that L.T. either completed or was making progress towards completing
all of her May 2011 IEP goals.  *See id.*  L.T.'s teachers also note in the report that L.T.
was working hard and improving on her goals.  *Id.*

**D.    May 2012 IEP**

On May 2, 2012, the IEP team met to develop L.T.'s May 2012 IEP.  AR 2921.
L.T.'s reading teacher reported that L.T. "continues to show great growth in her reading
skills," but lacks self-confidence and requires a lot of reassurance.  AR 2909.  L.T.'s
math teacher noted that L.T. "has worked very hard in resource math class this year [and]
has shown mastery of multi-digit addition and subtraction problems and has mastered all
of her basic multiplication facts."  *Id.*  L.T., however, "continues to struggle to solve
math story problems."  *Id.*  L.T.'s writing teacher reported that L.T. "requires a high
amount of support and attention . . . which signal [L.T.'s] lack of confidence in the
classroom."  AR 2910.  In regards to L.T.'s writing skills, her teacher noted that L.T.
"struggles to introduce the main idea with supporting details to the reader."  *Id.*

Additionally, L.T.'s "supporting details are generally off topic and do not support the main idea of her essay." *Id.*

L.T.'s IEP team determined that it would be best for L.T. to return to a special education classroom for both reading and writing in eighth grade. AR 2909, 2922. The May 2012 IEP provides for special education services in reading, written language, math, social emotional/behavioral, and study skills. AR 2918. Plaintiffs consented to these changes. AR 2920.

**E.    Aspen Institute and Falcon Ridge**

Near the end of L.T.'s seventh-grade year at Surprise Lake, L.T.'s mother discovered that L.T. had written in her journal about killing her parents and siblings. AR 773–74. L.T. also wrote in her journal that she wanted to die. AR 775. Following this discovery, Plaintiffs consulted with their medical insurance provider. AR 777. Their insurer recommended sending L.T. to the Aspen Institute for Behavioral Assessment ("Aspen Institute") in Utah. *Id.* The insurer agreed to pay most of the cost for L.T.'s stay at the Aspen Institute. *Id.*

On May 30, 2012, Plaintiffs withdrew L.T. from the District and enrolled her in the Aspen Institute. AR 2984. On June 30, 2012, L.T. was discharged from the Aspen Institute. *See* AR 3095. The Aspen Institute recommended that L.T. be placed in a residential treatment program. AR 3019. Immediately after L.T.'s discharge, Plaintiffs enrolled L.T. at Falcon Ridge Ranch ("Falcon Ridge"), a private residential treatment program in Utah. AR 3095.

On July 9, 2012, L.T.'s mother notified the District that L.T. was attending Falcon Ridge for six months.  AR 3094.  L.T.'s mother stated that she would contact the District in January 2013 to enroll L.T. and speak to staff about L.T.'s IEP.  *Id.*  Plaintiffs' medical insurance paid for six months of L.T.'s stay at Falcon Ridge.  AR 782.  After six months at Falcon Ridge, L.T. returned to Washington.  *Id.*  An IEP was not implemented for L.T. while she was at Falcon Ridge.  *See* AR 3099.

**F.    Columbia Junior High**

On January 29, 2013, L.T. reenrolled in the District.  AR 3110.  The District reviewed L.T.'s May 2012 IEP and determined that it was still current.  AR 3099.  The District also confirmed that L.T. did not have an IEP from Falcon Ridge.  *Id.*  The District reinstated services for L.T. according to her May 2012 IEP.  *Id.*  The District decided to wait and see how L.T. settled in to Columbia Junior High before deciding the proper course of action with respect to L.T.'s program.  *Id.*

On February 4, 2013, L.T. began attending classes as an eighth grader at Columbia Junior High.  AR 3105.  On February 6, 2013, the District held a staff meeting to review L.T.'s records and to apprise teaching staff of L.T.'s needs so they could serve L.T. appropriately.  AR 78, 80, 242–43, 3106.  Plaintiffs were not invited to this meeting.  AR 784, 3106.

On February 20, 2013, L.T.'s mother requested an IEP meeting to discuss L.T.'s IEP and services.  AR 860–61.  On February 27, 2013, L.T.'s IEP team met to discuss L.T.'s current IEP and whether changes should be made.  AR 141–42, 3115–29, 3136.  Representatives from Falcon Ridge participated in the meeting by phone to discuss L.T.'s

program and behavior.  AR 795.  The IEP team asked the Falcon Ridge representatives

questions about the program and what worked for L.T.  AR 796.  Plaintiffs also shared a

document about reactive detachment disorder with the IEP team.  AR 702, 3124.

Prior to the February 27, 2013 meeting, the District prepared a draft functional

behavioral assessment ("FBA") for L.T.  AR 3130–32.  The draft FBA notes that L.T.

"gets upset and yells or swears at other students" and "has been seen taking [school

supplies] from classes."  AR 3130.  The draft FBA states that a behavioral intervention

plan ("BIP") was not required for L.T. because L.T. was so new to the school and the

District would need more data before implementing a BIP, if one was needed.  AR 3131.

The draft FBA was not discussed at the February 27, 2013 meeting due to time

constraints.  AR 87, 797.

On March 3, 2013, L.T.'s mother emailed the District, asking why the District had

not yet amended L.T.'s May 2012 IEP.  AR 2105.  On March 8, 2013, L.T.'s mother met

with Nancy Fitta ("Fitta"), the District's director of special programs, and Kadee Tuttle, a

school psychologist, to discuss documents that Plaintiffs provided to the District and to

determine the next best steps to support L.T.'s needs through her IEP.  AR 3137.  At the

meeting, L.T.'s mother requested an independent education evaluation in speech and

language.  AR 3160.  L.T.'s mother also consented to the District's request to reevaluate

L.T.  AR 3138.  Fitta summarized the results of the meeting, stating that the District

should consider increasing L.T.'s time in special education and make other

accommodations to help with L.T.'s social difficulties.  AR 3146.

**G.    Emergency Expulsion**

On the same day as the March 8, 2013 meeting, L.T. threatened to shoot another student at school. AR 3144. The District placed L.T. on emergency expulsion. AR 3148–49. An emergency expulsion is an action taken by school administration when there is a threat to student safety or a significant disruption to the educational process. AR 412. An emergency expulsion is a temporary action meant to ensure student safety while school administration investigates the alleged misconduct and determines the best course of action. AR 413–14. Emergency expulsions are typically converted to another form of discipline, generally a short-term or long-term suspension. AR 413.

**H.    Return to Falcon Ridge**

On March 11, 2013, Plaintiffs notified the District by email that L.T. would be returning to Falcon Ridge for six months. AR 3150. Plaintiffs' medical insurance provider agreed to cover another six months at Falcon Ridge at 90% of the cost. AR 808. The District subsequently converted L.T.'s emergency expulsion to a short-term suspension of two school days. AR 3155–56. On March 18, 2015, the District notified Plaintiffs that it had terminated its reevaluation of L.T. due to her withdrawal from the District. AR 3157.

In May 2013, Plaintiffs began communicating with Fitta to see if the District would fund L.T.'s placement at Falcon Ridge when their second round of insurance coverage ran out. *See* AR 3163. Fitta ultimately informed Plaintiffs that the District was unable to support L.T.'s placement at Falcon Ridge because L.T. was not a resident of the District while she was living in Utah and the District's current documents did not reflect

1   a need for the residential placement that Plaintiffs had made.  AR 3191.  Fitta told

2   Plaintiffs that L.T. would need to be evaluated by the District in order for the District to

3   determine if a residential placement would be appropriate for L.T.  *Id.*

4       When the six months of insurance coverage ran out, Falcon Ridge allowed L.T. to

5   stay without payment because L.T.'s treatment team believed that she was a threat to

6   herself and others.  AR 813.

7   **I.      ALJ Hearing and Decision**

8       On December 11, 2013, Plaintiffs filed a due process complaint with Washington

9   State's Office of Administrative Hearings.  AR 1595.  Plaintiffs alleged that the District

10  committed numerous IDEA violations.  AR 1612–16.

11      In April 2014, the ALJ held a seven-day hearing during which twenty-nine

12  witnesses testified.  AR 2351–53.  Following the hearing, the ALJ rendered a twenty-

13  seven-page decision.  AR 2351–78.  The ALJ rejected all of Plaintiffs' claims,

14  concluding that (1) the District offered appropriate education services to L.T., (2) L.T.

15  made meaningful progress during her time in the District, and (3) Plaintiffs failed to

16  establish any right to reimbursement for their decision to place L.T. in Falcon Ridge.  AR

17  2368–77.

18                              **IV. DISCUSSION**

19      The parties filed cross-motions for summary judgment.  Dkts. 24, 27.  Plaintiffs

20  argue that the ALJ erroneously concluded that the District provided L.T. with a free

21  appropriate public education.  Dkt. 27 at 2.  The District, in turn, contends that the

22

1  evidentiary record and controlling legal authority support the ALJ's conclusion.  Dkt. 24
2  at 10.

3  **A.    Standard of Review**

4        Ordinarily, the Court grants summary judgment "if the movant shows that there is
5  no genuine dispute as to any material fact and the movant is entitled to judgment as a
6  matter of law." Fed. R. Civ. P. 56(a).  Plaintiffs, however, are seeking judicial review of
7  the ALJ's decision under the IDEA.  Dkt. 1.  Thus, the Court is not bound by the normal
8  rules of summary judgment review.  *See J.S. v. Shoreline Sch. Dist.*, 220 F. Supp. 2d
9  1175, 1184 (W.D. Wash. 2002) (citing *Jackson*, 4. F.3d. at 1472).

10        "When a party challenges the outcome of an IDEA due process hearing, the
11  reviewing court receives the administrative record, hears any additional evidence, and,
12  'bas[es] its decision on the preponderance of the evidence . . . .'" *R.B., ex rel. F.B. v.*
13  *Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (quoting 20 U.S.C.
14  § 1415(i)(1)(B)).  "Based on this standard, 'complete de novo review of the
15  administrative proceeding is inappropriate.'" *J.W.*, 626 F.3d at 438 (quoting *Van Duyn*,
16  502 F.3d at 817).  As the party challenging the ALJ's decision, Plaintiffs bear the burden
17  of proof in this case.  *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1103 (9th Cir.
18  2007).  Plaintiffs must show, by a preponderance of the evidence, that the ALJ's decision
19  should be reversed.  *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010).

20        Courts must give "due weight" to the administrative decision below and must not
21  "substitute their own notions of sound educational policy for those of the school
22  authorities which they review." *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist.*, 502 F.3d

1   811, 817 (9th Cir. 2007) (quoting *Rowley*, 458 U.S. at 206).  "A district court shall accord

2   more deference to administrative agency findings that it considers 'thorough and

3   careful.'" *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 908 (9th Cir. 2009)

4   (quoting *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)).

5   Here, the ALJ held a seven-day hearing during which twenty-nine witnesses testified.

6   AR 2351–53.  The ALJ rendered a twenty-seven-page decision, which contains a detailed

7   factual background and thorough legal analysis.  *See* AR 2351–78.  Because the ALJ's

8   decision is thorough and careful, the Court affords due weight to the ALJ's findings.[3]

9   **B.   Additional Evidence**

10          Before turning to the merits, the Court addresses the evidence proffered by the

11   parties.[4]  The District submits L.T.'s evaluation reports from 2014.  *See* Dkt. 25,

12   Declaration of Christopher Hirst, Ex. A.  Plaintiffs also submit evidence regarding events

13   subsequent to the administrative hearing.  *See* Dkt. 17, Exs. 1–3.

14          On review of an IDEA decision, the district court "shall hear additional evidence

15   at the request of a party."  20 U.S.C. § 1415(i)(2)(C)(ii).  The Court "need not consider

16   evidence that simply repeats or embellishes evidence taken at the administrative

17   hearing . . . ."  *E.M. v. Pajaro Valley Unified Sch. Dist.*, 652 F.3d 999, 1004 (9th Cir.

18   2011) (citing *Ojai*, 4. F.3d at 1473).  However, "evidence that is non-cumulative,

19   _____

20          [3] Even if the Court did not afford due weight to the ALJ's findings, the Court would
    reach the same conclusion in this case.

21          [4] The District previously moved to supplement the record.  Dkt. 12.  The Court allowed
    the parties to submit proposed evidence with their cross-motions for summary judgment.  Dkt.

22   28.  The Court asked the parties to address whether their proffered evidence was "additional
    evidence" in their respective responses and replies.  *Id.*

relevant, and otherwise admissible constitutes 'additional evidence' that the district court 'shall' consider pursuant to [the IDEA]." *Id.* at 1005. This standard includes "evidence concerning relevant events occurring subsequent to the administrative hearing." *Id.* at 1004.

The Court will accept the parties' proffered evidence. As the Ninth Circuit has observed, "after-acquired evidence 'may shed light' on the objective reasonableness of a school district's actions at the time the school district rendered its decision." *Id.* (citing *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)). Here, the parties' proffered evidence appears relevant to Plaintiffs' claims that L.T. regressed academically and required a residential placement.

**C.    Plaintiffs' Claims**

Plaintiffs argue that the District failed to provide L.T. with a free appropriate public education. Dkt. 27. Although Plaintiffs raised many claims before the ALJ and in their briefing before this Court, Plaintiffs' allegations can be categorized as follows: (1) the District violated the IDEA's procedural requirements; (2) the District violated the IDEA's substantive requirements; and (3) the District must reimburse Plaintiffs for L.T.'s placement at Falcon Ridge. Dkts. 27, 30.

**1.    Alleged Procedural Violations**

Plaintiffs raise the following procedural claims: (a) the District failed to amend L.T.'s IEP after her May 2011 evaluation; (b) the District failed to develop a new IEP for L.T. when she returned to the District in February 2013; (c) the District failed to include Plaintiffs in the February 6, 2013 meeting; (d) the District failed to prepare a FBA and

1  BIP for L.T.; and (e) the District failed to update L.T.'s IEP in 2013 when her May 2012

2  IEP expired.  Dkts. 27, 30.

3        **a.**      **Failure to Amend IEP After May 2011 Evaluation**

4        Plaintiffs first claim that the District failed to amend L.T.'s IEP after her May

5  2011 evaluation.  Dkt. 27 at 18.  Plaintiffs, however, did not raise this claim in their

6  administrative complaint before the ALJ.  *See* AR 1640–44, 2353–55.  Under the IDEA,

7  the Court's review is limited to issues raised in the administrative complaint.  *County of*

8  *San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1465 (9th Cir. 1992).  A

9  plaintiff alleging IDEA violations generally must exhaust administrative remedies before

10  pursuing claims in federal court.  *Porter v. Bd. of Trs. of Manhattan Beach Unified Sch.*

11  *Dist.*, 307 F.3d 1064, 1069 (9th Cir. 2002); *Hoeft v. Tucson Sch. Dist.*, 967 F.2d 1298,

12  1303 (9th Cir. 1992).  Because Plaintiffs did not exhaust their administrative remedies on

13  this claim, Plaintiffs may not raise it for the first time on appeal to this Court.  Plaintiffs'

14  claim is also precluded because it concerns events outside of the IDEA's two-year statute

15  of limitations.  *See* WAC 392-172A-05080.

16        Even if Plaintiffs' claim was properly before the Court, the record establishes that

17  L.T.'s IEP team—including Plaintiffs—met on May 11, 2011 to review the May 2011

18  evaluation and prepare L.T.'s May 2011 IEP.  AR 2873, 2876–90.  The record further

19  shows that L.T.'s May 2011 IEP was developed to reflect the results of the District's

20  evaluation and the UW report.  *See* AR 2876–90.

21

22

1          **b.      Failure to Develop New IEP in January 2013**

2          Next, Plaintiffs allege that the District failed to develop a new IEP for L.T. when

3   she returned to the District from Falcon Ridge in January 2013.[5]  Dkt. 27 at 19–20.  The

4   ALJ determined that "it was reasonable for the District to initially provide the services in

5   [L.T.'s May 2012 IEP] while it observed how [L.T.] settled in to her new school and

6   conducted a reevaluation."  AR 2372.

7          The IDEA sets forth a school district's obligations to a student with an existing

8   IEP who transfers from another state within the same academic year.  *See* 20 U.S.C.

9   § 1414(d)(2)(C)(i)(II).  The new school district must provide the student with "services

10   comparable to those described in the previously held IEP" until the school district

11   conducts an evaluation, if the district determines such an evaluation is necessary, and

12   develops a new IEP, if appropriate.  34 C.F.R. § 300.323; *see also* WAC 392-172A-

13   03105(5).

14          In this case, however, L.T. did not have an IEP in Utah when she transferred back

15   to Washington within the same academic year.  At the beginning of the 2012–13 school

16   year, L.T. attended Falcon Ridge in Utah.  *See* AR 3095.  An IEP was not developed for

17   L.T. during her time at Falcon Ridge. Dkt. 30 at 16.  When L.T. returned to the District

18   in January 2013, her May 2012 IEP had not yet expired.  *See* 34 C.F.R. § 300.324(b)(1)(i)

19   (school districts must review a student's IEP at least annually).  The District decided to

20   reinstate services for L.T. according to her May 2012 IEP while it observed how L.T.

21   _____

22          [5] L.T. reenrolled in the District on January 29, 2013, AR 3110, and began attending
classes on February 4, 2013.  AR 3105.

1  settled into Columbia Junior High.  AR 3099.  On February 27, 2013, L.T.'s IEP team

2  met to discuss L.T.'s current IEP and whether changes should be made.  AR 141–42,

3  3115–29, 3136.  On March 8, 2013, the District initiated a reevaluation of L.T. with

4  Plaintiffs' consent.  AR 3138.  The reevaluation planned to review documents from the

5  Aspen Institute and Falcon Ridge and conduct additional testing of L.T.  *Id.*  The District

6  ultimately terminated its reevaluation of L.T. due to her withdrawal from the District on

7  March 11, 2013.  AR 3150, 3157.

8         Based on this evidence, the ALJ properly determined that the District acted

9  reasonably in implementing the May 2012 IEP upon L.T.'s return to the District in

10 January 2013.  The District reinstated services according to L.T.'s most recent and

11 current IEP.  About three weeks after L.T. began attending classes at Columbia Junior

12 High, the District held a meeting with L.T.'s IEP team to discuss whether changes should

13 be made to L.T.'s program.  The District then initiated a reevaluation of L.T.  Under

14 these circumstances, the District did not violate the IDEA.

15        Plaintiffs argue that the ALJ improperly applied a reasonableness standard in

16 assessing this claim.  Dkt. 27 at 19.  Federal and state IDEA regulations provide that a

17 school district school should revise or develop a new IEP when it is "appropriate" to do

18 so.  *See* 34 C.F.R. §§ 300.323, 300.324; WAC 392-172A-03105(5), -03110(3)(b).  The

19 ALJ's reasonableness analysis is consistent with these regulations.  In sum, Plaintiffs

20 have not established that the District violated the IDEA's procedural requirements by not

21 developing a new IEP for L.T. when she returned to the District in January 2013.

22

### c.  Failure to Include Plaintiffs in February 6, 2013 Meeting

With regard to Plaintiffs' claim that the District failed to include Plaintiffs in the February 6, 2013 meeting, Plaintiffs did not raise this claim before the ALJ. *See* AR 1640–44, 2353–55. This claim also lacks merit. On February 6, 2013, teaching staff met to discuss L.T.'s reenrollment and services. AR 3106. L.T.'s teachers learned about L.T.'s May 2012 IEP, as well as L.T.'s educational needs. AR 78, 80, 242–43, 3106. A school district need not include parents in conversations involving school district personnel on issues such as teaching methodology, lesson plans, or coordination of service provision. *See* 34 C.F.R. § 300.501(b)(3); WAC 392-172A-05000(2)(c). Moreover, no changes were made to L.T.'s IEP during the February 6, 2013 meeting, and L.T.'s IEP team—including Plaintiffs—met shortly thereafter on February 27, 2013. AR 3115–29, 3136.

### d.  Failure to Prepare FBA and BIP

Plaintiffs also claim the District failed to prepare a FBA and BIP for L.T. Dkt. 27 at 24. Again, Plaintiffs did not raise this claim before the ALJ. *See* AR 1640–44, 2353–55. Instead, Plaintiffs argued that the District did not address L.T.'s worsening behavior after she returned to the District from Falcon Ridge in February 2013. AR 1641, 2373. As to that claim, the ALJ found that the District "acted reasonably in identifying and beginning to address [L.T.'s] behavior in the short time period before she was withdrawn from the District." AR 2373. The Court agrees. The evidence in the record demonstrates that the District identified L.T.'s behavioral problems and was taking steps to address them. For example, the District was in the process of drafting a FBA for L.T.

1  in February 2013.  AR 3130–32.  In the interim, one of L.T.'s teachers prepared a chart to

2  help manage L.T.'s behavior in class.  AR 3133–34.  L.T.'s teacher shared this chart with

3  other teachers in case they wanted to use it in their classes.  AR 3133.  During the March

4  8, 2013 meeting, Fitta talked with Plaintiffs about increasing L.T.'s special education

5  time, providing a para-educator to walk with L.T. between classes and sit with her at

6  lunch, and having two general education classes with the same teacher.  AR 801.

7  **e.      Failure to Update IEP When May 2012 IEP Expired**

8          Finally, Plaintiffs contend that the District failed to update L.T.'s IEP in 2013

9  when her May 2012 IEP expired.  Dkt. 27 at 21.  The ALJ rejected this argument,

10  concluding that the District was not obligated to serve a student who does not reside

11  within the school district.  AR 2376.

12          Under federal IDEA regulations, a school district must have an IEP in effect for

13  "each child with a disability *within its jurisdiction*" at the beginning of each school year.

14  34 C.F.R. § 300.323(a) (emphasis added).  Washington's regulations similarly provide:

15  "At the beginning of each school year, each school district must have an IEP in effect for

16  each student eligible for special education that it is *serving through enrollment in the*

17  *district*."  WAC 392-172A-03105(1) (emphasis added).  "[N]either federal nor state

18  regulations specify when a child 'enrolls' for purposes of the IDEA."  *Ms. S. ex rel. G. v.*

19  *Vashon Island Sch. Dist.*, 337 F.3d 1115, 1130 (9th Cir. 2003), *superseded on other*

20  *grounds by* 20 U.S.C. § 1414(d)(1)(B).  However, Washington regulations regarding

21  school district financing provide that an "'enrolled student' means a person residing in

22  Washington state" who satisfies five conditions.  WAC 392-121-106.

1    In the Ninth Circuit, courts have looked to state law to determine a student's

2    residency.  *See, e.g.*, *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1525 (9th Cir. 1994); *J.S.*,

3    220 F. Supp. 2d at 1191–93.  For the purposes of IDEA, Washington defines "student

4    residence" to mean "the physical location of a student's principal abode—i.e., the home,

5    house, apartment, facility, structure, or location, etc.—where the student lives the

6    majority of the time."  WAC 392-137-115; *see also* WAC 392-172A-01160.  Put another

7    way, "a student's residency is just that: where he lives."  *J.S.*, 220 F. Supp. 2d at 1192.  In

8    determining a student's residence, the Court considers: (1) the student's mailing address;

9    (2) the student's principal abode may be different than the principal abode of the

10   student's parents; (3) the lack of a mailing address for a student does not preclude

11   residency; and (4) if the student is expected to reside at the address for twenty

12   consecutive days or more.  WAC 392-137-115.

13       In this case, the District did not have a duty to update L.T.'s IEP in 2013 because

14   L.T. was not a resident of Washington at that time.  In March 2013, L.T. left the District

15   and returned to Utah to attend Falcon Ridge for six months.  AR 3150.  Although

16   Plaintiffs continued to live in Washington, L.T. was living in Utah on a daily basis.

17   Under Washington law, L.T. was not a resident of the state and thus the District did not

18   have an obligation to update L.T.'s IEP in 2013.  *See J.S.*, 220 F. Supp. 2d at 1193.

19       **2.    Alleged Substantive Violations**

20       Plaintiffs raise the following substantive claims: (a) L.T. regressed academically

21   between 2011 and 2012; (b) the May 2012 IEP improperly recycled goals from the May

22   2011 IEP; (c) the May 2012 IEP was inappropriate when it was developed; (d) the

District wrongfully determined that L.T. was not eligible for speech and language services; (e) the District did not provide sufficient para-educator support for L.T. in 2011; and (f) the District inappropriately reduced L.T.'s social emotional/behavioral services in January 2012. Dkts. 27, 30.

### a.   Academic Regression

Plaintiffs argue that the District denied L.T. a free appropriate public education because L.T. regressed academically between 2011 and 2012. Dkt. 27 at 18; Dkt. 30 at 13–15. The ALJ determined that Plaintiffs failed to show that L.T. regressed academically or that any such regression was the result of the District violating the IDEA. AR 2370.

Upon review, the Court finds that the ALJ properly rejected this claim. The evidence in the record demonstrates that L.T. made progress on her IEP goals between 2011 and 2012. For example, L.T.'s progress report from February 2012 shows that L.T. either completed or was making progress towards completing all of her May 2011 IEP goals. AR 2909–12. L.T.'s teachers also noted that L.T. was working hard and improving on her goals. *See id.* In May 2012, L.T. was earning mostly Bs and Cs. AR 2912. Academic testing indicated that L.T. was at or near grade level in core areas such as basic reading skills, reading comprehension, and written language. *Id.* L.T.'s reading teacher reported that L.T. "continues to show great growth in her reading skills." AR 2909. L.T. went from reading 68 words per minute on a sixth grade reading passage to 115 words per minute on a seventh grade reading passage. *Id.* L.T.'s math teacher noted that L.T. "has worked very hard in resource math class this year [and] has shown mastery

1   of multi-digit addition and subtraction problems and has mastered all of her basic

2   multiplication facts." *Id.* L.T.'s writing teacher stated that L.T. was "somewhat

3   successful" in her writing skills class. AR 2910. Although L.T. was earning a D in her

4   writing class, her writing teacher reported that L.T.'s grade "does not reflect her actual

5   skills and ability in the classroom." *Id.* According to L.T.'s writing teacher, L.T.

6   "commonly will choose to not work when she is struggling with an issue that is not work

7   related, [and] this directly affects her grade." *Id.* With regard to study skills, L.T. had a

8   95% work completion rate in her special education classes and a 70–80% work

9   completion rate in her general education classes, which was "a dramatic improvement

10  over last year." AR 2912.

11      Relying on *Rowley*, Plaintiffs contend that L.T.'s modified grading system cannot

12  establish that L.T. was making meaningful progress. Dkt. 30 at 14. *Rowley*, however,

13  did not establish one standard for determining what constitutes meaningful educational

14  benefit under the IDEA. 458 U.S. at 202. In *Rowley*, the Supreme Court emphasized that

15  educational benefit must be measured in relation to the student at issue. *See id.* at 202.

16  The Supreme Court went on to note that when a special education student is "being

17  educated in the regular classrooms of a public school system," the grading and

18  advancement system employed in the regular classroom "constitutes an important factor

19  in determining educational benefit." *Id.* at 203. School districts, however, are not

20  required to "maximize each child's potential commensurate with the opportunity

21  provided other children." *Id.* at 198 (internal quotation marks omitted). Rather, school

22  districts must provide students with a "basic floor of opportunity." *Id.* at 200.

1    Under the circumstances in this case, L.T.'s educational program was

2    individualized and tailored to her needs.  L.T. was also making progress on her academic

3    goals, as discussed above.  In sum, Plaintiffs have failed to show that the ALJ's

4    conclusion regarding L.T.'s academic regression was erroneous.

5              **b.    Recycled Goals**

6    Next, Plaintiffs claim that the May 2012 IEP improperly recycled goals from the

7    May 2011 IEP.  Dkt. 27 at 18–19; Dkt. 30 at 13–15.  Plaintiffs did not raise this claim

8    before the ALJ, *see* AR 1640–44, 2353–55, and thus it is not properly before the Court.

9    Plaintiffs' claim also fails on the record.  The evidence shows that the District

10   updated L.T.'s May 2012 IEP to reflect L.T.'s progress under her May 2011 IEP.  To that

11   end, the District developed new goals for L.T., adjusted old goals towards which L.T. had

12   made progress, and noted old goals with which L.T. continued to struggle.  *Compare* AR

13   2878–82 (May 2011 IEP goals), *with* AR 2909–12 (May 2012 IEP goals).  *See also* AR

14   1260–67.  For example, the District adjusted L.T.'s writing skill goals to include writing

15   four-paragraph essays and using an increased number of specific details to support main

16   ideas in paragraphs.  AR 2910–11.  With regard to L.T.'s reading fluency goals, the

17   number of words per minute remained the same but L.T.'s progress was to be measured

18   using more difficult reading passages.  AR 1261–62.  Although L.T. continued to

19   struggle with math story problems, she showed improvement in other areas of math and

20   received new math goals to reflect that progress.  AR 1262–64.  Specifically, L.T.

21   received new math goals for adding and subtracting fractions, multiplying and dividing

22   multi-digit decimal numbers, and identifying common decimal/fraction equivalents.  AR

1262–64, 2910.  The District also added new social skill goals related to L.T.'s ability to

stay on topic during class discussions and tasks.  AR 1265–66, 2881–82, 2911–12.

> **c.**     **Appropriateness of May 2012 IEP**

Plaintiffs assert that L.T.'s May 2012 IEP was inappropriate when developed.

Dkt. 27 at 19–21.  Plaintiffs, however, did not challenge the appropriateness of the May

2012 IEP before the ALJ.  *See* AR 1640–44, 2353–55.

Even if this claim was properly before the Court, the May 2012 IEP was

appropriate at the time it was developed.  The Court does not judge the appropriateness of

an IEP in hindsight.  *Adams*, 195 F.3d at 1149.  Rather, the Court "look[s] to the [IEP's]

goals and goal achieving methods at the time the plan was implemented and ask[s]

whether [those] methods were reasonably calculated to confer [the student] with a

meaningful benefit."  *Id.*  For the reasons discussed in the two preceding subsections, the

Court finds that the May 2012 IEP was reasonably calculated to confer L.T. with a

meaningful benefit.  In developing the May 2012 IEP, the District reviewed L.T.'s

performance under her May 2011 IEP.  The District updated L.T.'s May 2012 IEP to

reflect L.T.'s progress and address the areas with which L.T. still struggled.  Plaintiffs

also consented to the May 2012 IEP.  The goals and services outlined in the May 2012

IEP were appropriate at the time it was developed and reasonably calculated to provide

L.T. with a meaningful educational benefit.

> **d.**     **Speech and Language Services**

Plaintiffs allege that the District wrongful determined that L.T. was not eligible for

speech and language instruction.  Dkt. 27 at 24.  The District made this determination as

1  a result of L.T.'s May 2011 evaluation, which found that L.T. did not require services in

2  speech, language, or pragmatics.  AR 2859–60.  The ALJ concluded that Plaintiffs' claim

3  was precluded because the May 2011 evaluation was conducted outside of the period

4  covered by the IDEA's two-year statute of limitations.  AR 2376 (citing WAC 392-172A-

5  05080).  Upon review, the Court finds that the ALJ properly rejected this claim.

6          **e.      Para-Educator Support**

7          With regard to Plaintiffs' claim that the District did not provide sufficient para-

8  educator support in 2011, Dkt. 30 at 14, Plaintiffs failed to raise this issue before the ALJ.

9  *See* AR 1640–44, 2353–55.  Thus, this claim is not properly before the Court on review.

10  The Court notes, however, that the limited evidence in the record contradicts Plaintiffs'

11  argument.  Pursuant to her May 2011 IEP, L.T. was placed in a general education

12  classroom with para-professional support.  AR 2839; *see also* AR 1123, 1133 (describing

13  L.T.'s placement in general education classroom and consultation of resource teachers).

14  Due to L.T.'s success in this placement, her May 2011 IEP was amended with Plaintiffs'

15  consent in December 2011 to provide continued "special education services in her

16  general education language arts class with support from a special education teaching

17  assistant."  AR 2893.  Plaintiffs have not cited any evidence to the contrary.

18          **f.      Social Emotional/Behavioral Services**

19          Finally, Plaintiffs argue that the District denied L.T. a free appropriate public

20  education by reducing her social emotional/behavioral services in January 2012.  Dkt. 27

21  at 19.  The ALJ rejected this argument, concluding that the record did not "demonstrate

22

1  that either the number of minutes of social skills instruction offered or the social skills

2  goal was inappropriate to serve [L.T.'s] needs in this area."  AR 2377.

3  The Court agrees with the ALJ's conclusion.  As a result of L.T.'s "overall success

4  in her general education and special education placement," L.T.'s IEP team decided that

5  L.T. was no longer in need of forty-seven minutes of social emotional instruction per day.

6  AR 2899.  Accordingly, the IEP team reduced L.T.'s social emotional instruction to ten

7  minutes per day on January 30, 2012.  AR 2898.  Plaintiffs were notified of and

8  consented to this change.  AR 2898, 2901.  L.T.'s progress report from February 2012

9  shows that L.T. completed two of her three social emotional/behavioral goals and showed

10  "great improvement" on the third goal.  AR 2904.  L.T.'s May 2012 IEP further states:

11  "Since L.T. has stopped receiving 47 minutes daily of social emotional instruction in the

12  resource room, she has continued to demonstrate overall success in special education and

13  general education classes."  AR 2911.  Plaintiffs have not established that the ALJ's

14  conclusion was erroneous.

15  **3.    Additional Claims Before ALJ**

16  Plaintiffs do not challenge the disposition of their additional claims before the

17  ALJ.  *See* Dkts. 27, 30.  Upon review, the Court concludes that the ALJ properly rejected

18  those claims.

19  **4.    Right to Reimbursement**

20  Finally, Plaintiffs contend that they are entitled to reimbursement from the District

21  for L.T.'s placement at Falcon Ridge.  Dkt. 30 at 21.  "IDEA authorizes reimbursement

22  for the cost of private special-education services when a school district fails to provide a

1    [free appropriate public education] and the private-school placement is appropriate . . . ."

2    *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009).  Because Plaintiffs have failed

3    to show that the District denied LT. a free appropriate public education, the Court need

4    not address Plaintiffs' arguments concerning reimbursement.

5                                    **V. ORDER**

6           Therefore, it is hereby **ORDERED** that the District's motion for summary

7    judgment (Dkt. 24) is **GRANTED** and Plaintiffs' motion for summary judgment is

8    **DENIED** (Dkt. 27).  The clerk shall enter judgment in favor of Defendant and close this

9    case.

10          Dated this 9th day of September, 2015.

11

12

13                                    _____

14                                    BENJAMIN H. SETTLE
                                      United States District Judge

15

16

17

18

19

20

21

22